[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 411 
Appellants, Eloise Wray and Charles Hatmaker, filed suit seeking the specific performance of a written lease agreement they had entered into with the appellee, Irby Harris. Also named as a defendant below was Harris's wife, Martha. Since certain issues in regard to damages were presented, a trial by jury was had, and the jury returned a verdict of $40,000 for the appellants against Irby Harris. Martha Harris had been dismissed as a party on motion of the defendants at the conclusion of the plaintiffs' case. After Irby Harris filed a motion for new trial along with a motion for judgment notwithstanding the verdict, the trial court entered a final judgment denying specific performance and ordering a remittitur of the verdict to $25,000. The appellants contend that the trial court erred in not granting specific performance, and they petition this court to reverse that judgment and to reinstate the full amount of the jury verdict.
Eloise Wray and Charles Hatmaker, plaintiffs at the trial court level, agreed to go into the truck stop business together. Wray had past experience in operating a restaurant and Hatmaker was an experienced gas station operator, so the plaintiffs decided to divide their responsibilities at the truck stop in the same fashion. Irby Harris, the defendant, was the Union 76 oil jobber for DeKalb County for some time prior to the agreement which is the basis of this suit, and he owned a tract of land near Interstate 59 which was suitable for use as a truck stop.
On March 6, 1972 Harris agreed to build a filling station, restaurant, and ten motel units on his property near Interstate 59, and he further agreed to lease the realty and improvements to the plaintiffs with an option to purchase after ten years. The terms of the written agreement, which was prepared by Harris's former attorney,[1] are as follows:
 "This agreement is made and entered into on this, the 6th day of March, 1972, by and between Irby C. Harris (hereinafter referred to as Harris) and Charles Hatmaker and Eloise Wray (hereinafter referred to as Lessee).
 "This agreement is made for and in consideration of the mutual promises hereinafter set out:
 "1. That the Lessee has, on this day, paid to Harris the sum of $1,000, receipt of which is hereby acknowledged, and the Lessee does hereby promise to pay an additional sum of $9,000 by August 1, 1972; and the total of these two payments being $10,000 shall then be considered as a contract to construct a building. If construction is not begun by 8/1/72, $1,000 deposit will be refunded.
 "2. Harris does hereby contract and agree to build a building approximately 40' X 84' plus 36' X 66' containing a filling station, restaurant, and ten motel units on certain property located on Highway No. 35 within the City Limits of Fort Payne, Alabama, and located generally to the West of Abbott's Marina and Shell Station. Such construction shall be started no later than August 1, 1972, and after the completion of the said building and improvements on said property, he will enter into a lease with the Lessee for a monthly land rental of $350 per month for a period of ten years. At the end of that time, the Lessee may exercise their option to purchase the said property and the improvements thereon at an amount *Page 412 
of $65,000, payable in monthly installments for ten years.
 "3. The Lessee further agrees to finance the construction cost above the said amount of $10,000 at the Fort Payne Bank to be repaid within ten years from the date of the loan, such funds to be paid to Harris as the contractor and builder of the buildings referred to above. Harris further agrees to make any mortgage, or to co-sign, or to act as guaranty for the loan to aid the Lessee in obtaining the construction cost of the building to be constructed on the said property."
Each of the parties — Wray, Hatmaker and Harris — signed this agreement. Martha Harris, Irby's wife, did not sign this agreement, nor was any evidence presented that she participated in the negotiations surrounding the agreement.
In October of 1972 Harris sold his Union 76 distributorship to Bill Davenport. At the time of the sale Harris and his wife entered into a written agreement with Davenport Gas Oil Company, leasing to it all of the truck stop property "used for and constituting an oil and gasoline service station including drives and parkways and excluding all other portions of said property." Under the lease Davenport was given the right to supply the truck stop with Union 76 products for a period of ten years at a rental of two cents for each gallon of fuel sold at the truck stop. These rental payments were to be paid monthly to Irby and Martha Harris.
Construction on the truck stop was completed in May of 1973. Harris offered to put Wray and Hatmaker in possession of the premises if they would execute his lease agreement. However, Wray and Hatmaker refused to sign the Harris lease because it gave one cent per gallon of the petroleum lease revenues to Harris. Wray and Hatmaker then offered their own lease agreement, which would have completely divested Harris of any of the petroleum lease revenues. Harris refused to sign the Wray-Hatmaker lease, so the appellants instituted this action for specific performance on July 11, 1973. After this breakdown in negotiations between Harris and the appellants occurred, Harris testified that he spent an additional $35,000 on improvements for the truck stop. Harris leased the truck stop property to Lowell and Donald Fobbus on July 16, 1973.
Wray and Hatmaker contend that, by entering into the petroleum lease in October 1972, Harris attempted to lease the truck stop property twice, and that specific performance of the March 6, 1972 agreement should be decreed. We agree that a decree of specific performance should have been granted, and we therefore reverse the trial court's decision on this issue.
It is true that "[t]he equitable remedy of specific performance of agreements for the sale of lands rests largely in judicial discretion, directed and regulated by defined rules." Carlisle v. Carlisle, 77 Ala. 339, 341 (1884). Thus, the exercise of discretion by the trial court is guided, and the decision to grant or deny specific performance can be overturned when shown to be palpably erroneous. Although the trial judge in this case did not give any reasons for his denial of specific performance, the appellants presented a clear case revealing the inadequacy of their remedy at law: the contract was for a lease of certain realty and an option to purchase the same. Since this certain portion of real property is recognized as being unique, and since the option would be forever lost without the granting of specific performance, the March 6, 1972 agreement was the proper subject of an action for specific performance. See Ala. Code tit. 9, § 52 (1958).
However, several requirements must be met before a decree will be issued:
 "The contract must be just, fair, and reasonable; must not have originated in mistake, or surprise, or violation of confidence, or breach of trust, or advantage of condition, nor been obtained by any unconscientious or unfair methods; must be reasonably certain in respect to the subject-matter, the terms, and stipulations; must be founded on a valuable consideration, and its performance not work hardship or injustice."
Carlisle v. Carlisle, 77 Ala. 339, 341 (1884). The appellees claim that the March 6, 1972 *Page 413 
agreement failed to meet these requirements and thus justified the denial of specific performance. We disagree.
The appellees argue that the description of the realty in the March 6 agreement was inadequate, and that the agreement thus violated the Statute of Frauds, Ala. Code tit. 20, § 3 (5) (1958). However, the contract identified the city in which the realty was located, the property sold was "certain, — in that it [could] be made certain," Homan v. Stewart, 103 Ala. 644,650, 16 So. 35, 36 (1894), and the highway on which it was located was identified. This court has held that "a general uncertain description can be made specific and certain by parol evidence of concurrent facts and circumstances sufficient to that end." Dobson v. Deason, 248 Ala. 496, 498, 28 So.2d 418,419 (1946); accord, Goodwyn v. Jones, 288 Ala. 71, 77,257 So.2d 320, 325 (1971); Hamilton v. Stone, 202 Ala. 468,80 So. 852 (1919). The evidence presented in this case (subsequent performance of the parties, etc.) did not contradict the description of the land given in the writing, but instead made that description certain. Hamilton v. Stone, 202 Ala. at 469,80 So. at 853; cf. Howison v. Bartlett, 141 Ala. 593,37 So. 590 (1904) (description made certain by a survey required by the contract).
The appellees contend that specific performance should be denied since equity will not enforce a contract resulting in hardship or injustice. The appellees claim that they would lose $35,000 in improvements and extensive petroleum lease revenues if a decree of specific performance were issued. We fail to find any merit in the appellees' contention, for it is based on two incorrect presumptions: that a vendor, to avoid a decree for specific performance, can voluntarily erect improvements on the realty and thereby claim hardship and injustice as a defense; and that Wray and Hatmaker will not be the victims of injustice if a decree of specific performance is not issued. Though the appellees were the perpetrators of their own injury, the trial court will be able to adjust the equities on remand to avoid any unjust enrichment to Wray and Hatmaker.
It is claimed that the appellants, Wray and Hatmaker, are guilty of inequitable conduct, and thus should be denied equity in this case. It is true that Wray and Hatmaker did not pay the $10,000 in earnest money on time, but it is also true that Harris received the money when paid and retained it without objection. He therefore waived any right he might have had to assert that delinquency. The other alleged instances of inequitable conduct — failure to arrange financing, refusal to take possession under the Harris lease — are likewise without merit.
Specific performance will not be withheld when the defendant-vendor has executed a second lease to a third party covering only a portion of the realty involved in the contract. Since the Davenport Gas Oil Company was not joined as a defendant in this suit, we will not adjudicate its rights in reference to those of Wray and Hatmaker. However, Harris did not part with all of the truck stop property in the Davenport lease, and that portion retained would be subject to a decree of specific performance.
Though a decree of specific performance is in order against the appellee, Irby C. Harris, the dismissal of his wife by the trial court was not in error. Mrs. Harris did not sign the March 6, 1972 agreement, nor did she in any way participate in the negotiations surrounding said agreement. Her signatures on the Davenport petroleum lease and on the proposed Harris lease merely indicated her acquiescence to the terms stated in those documents, which differ from those in the March 6 agreement. This, without more, will not be sufficient to bind Mrs. Harris to the March 6 agreement. Williams v. Owens, 273 Ala. 625, 628,143 So.2d 633, 636 (1962).
Since we hold that specific performance should be granted, this court must address the issue of damages. The jury in this case awarded the appellants $40,000 in damages, which the trial judge remitted to $25,000. For the reasons given below, we question *Page 414 
the necessity of allowing any of these damages on remand.
Wray and Hatmaker were allowed to recover their out-of-pocket expenses and the reasonable value of their services as damages. Both of these expense items were incurred in preparation for the performance of the agreement. Thus, since specific performance has been granted, Wray and Hatmaker have been "put in the position [they] bargained for and should not recover expenses [they] would have had if the contract had been properly performed." D. Dobbs, Law of Remedies § 12.8, at 843 (1973). Thus, these items should not be allowed in the calculation of damages on remand.
Neither should Wray and Hatmaker recover damages for profits lost while performance was delayed. "Profits speculative, conjectural or remote, are not, generally, regarded as an element in estimating the damages." Brigham Co. v. Carlisle,78 Ala. 243, 248 (1884); accord, Port City Construction Co. v.Henderson, 48 Ala. App. 639, 646, 266 So.2d 896, 902 (Civ.App. 1972). Wray and Hatmaker were starting a new business, and they had no prior records on which profits could reasonably be based. Therefore, expected profits are not allowable as damages in this case. Paris v. Buckner Feed Mill, Inc., 279 Ala. 148,151, 182 So.2d 880, 883 (1966); Blankenship v. Lanier, 212 Ala. 60,62, 101 So. 763, 765 (1924); Taylor v. Shoemaker,34 Ala. App. 168, 172, 38 So.2d 895, 899 (1948), cert. denied,251 Ala. 601, 38 So.2d 900 (1949).
The issue of damages is remanded to the trial court with instructions to mold a decree "to protect the rights of all parties and do complete justice between them." Moss v. Cogle,267 Ala. 208, 216, 101 So.2d 314, 321 (1958). Since this court has ordered specific performance, the trial court, acting as a court of equity, is empowered to adjust the quantity of damages awarded even though no cross-appeal was entered. Grooms v.Brown-Marx Co., 239 Ala. 284, 286, 195 So. 215, 217 (1940).
The trial court's denial of specific performance is reversed, and the case is remanded for a reassessment of the damages in accordance with this opinion. The trial court's order dismissing Mrs. Harris as a party defendant is hereby affirmed.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
MADDOX, FAULKNER, SHORES and BEATTY, JJ., concur.
[1] Mr. Harris was represented by his former attorney at the trial court level. The attorneys who represented him on appeal had no connection with the drafting of the agreement at issue.